**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

MEGAN ROBBINS,
BREANNA GASPER,
JASON SALBATO,

      Plaintiff.

v.

CUSTER COUNTY,
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CUSTER COUNTY,
CUSTER COUNTY SHERIFF'S OFFICE,
LLOYD RICH SMITH, SHERIFF, IN HIS OFFICIAL CAPACITY.

      Defendants.

---

### COMPLAINT AND JURY DEMAND

Plaintiffs Megan Robbins, Breanna Gasper, and Jason Salbato, by and through undersigned counsel, Rachel B. Maxam of the Law Office of Rachel B. Maxam, PLLC, and Yun Wang of BTW Legal, states and alleges as follows:

### <u>JURISDICTION AND VENUE</u>

1.  This action arises under the Constitution of the United States pursuant to U.S.C. § 1983 and 42 U.S.C. § 1985.

2.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

3.  Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in Custer County, Colorado.

### <u>PARTIES</u>

1

1.    Plaintiff Megan Robbins is a citizen of the United States and a resident of Colorado. Robbins was formerly employed by the Custer County Sheriff's Office.

2.    Plaintiff Breanna Gasper is a citizen of the United States and a resident of Colorado. Gasper was formerly employed by the Custer County Sheriff's Office.

3.    Plaintiff Jason Salbato is a citizen of the United States and a resident of Colorado. Salbato was formerly employed by the Custer County Sheriff's Office.

4.    Custer County is a county government located in Colorado with a principal address at 702 Rosita Ave, Westcliffe CO 81252.

5.    Defendant Board of County Commissioners of the County of Custer County ("BOCC") is a county government entity and a political subdivision of the County and State of Colorado with a principal address at 702 Rosita Ave, Westcliffe CO 81252.  Pursuant to C.R.S. 30-11-105, the County is named as the "Board of County Commissioners of the County of Custer" because "all suits against a county, should be against "The board of county commissioners of the county of [name of the county]."

6.    Defendant Custer County Sheriff's Office (the "Sheriff's Office") is a county government entity and a political subdivision of the County and State of Colorado with a principal address at 702 Rosita Ave, Westcliffe CO 81252.

7.    Defendant Sheriff Lloyd Rich Smith, at all relevant times to this Complaint, was the Custer County Sheriff and acted under the color of law. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

8.    At the times relevant to this Complaint, the Sheriff was Lloyd Rich Smith.

9.    As Sheriff, Defendant Lloyd Rich Smith makes final decisions, such as hiring and firing

employees and what criminal prosecutions will or will not be pursued, are final and cannot

be overruled by any other authority.

10.   Sheriff Smith delegated authority to Undersheriff Barnes to make final decisions on his

behalf.

11.   Until the incidents described in this Complaint, the Plaintiffs had no history of discipline

with the Sheriff's Office.

12.   At the beginning of 2024, the Plaintiffs received pay increases.

***Complaints Regarding Discrimination and Misconduct***

13.   In February 2023, Robbins was injured on the job, had surgery, and was placed on "light

duty" (*i.e.*, admin work due to her physical limitations).

14.   On or about the month of April 2023, Undersheriff Barnes questioned multiple Sheriff's

Office employees about whether Megan Robbins received "special treatment" due to her

sexual orientation.

15.   On or about the spring of 2023, Robbins, Gasper, Salbato, and others openly questioned

Barnes' behavior towards Robbins as discriminatory on the basis of sexual orientation.

16.   On or about May 2023, Robbins, Gasper, and Salbato made complaints with the County

HR Director, Braden Wilson and with Sheriff Smith about Barnes.

17.   As stated by Wilson, the number of people complaining and the number of complaints

regarding the sheriff's office quickly grew in a short window of time."

18.   In HR Director Wilson's words, "given the number and severity of the complaints, I asked

Employers Council [a third-party organization] to investigate." He also noted that "I was

3

met with much resistance from Custer County Sheriff, Lloyd "Rich" Smith, including a refusal to participate in the investigation."

19.    On or about May 2023, an investigation was opened with Employers Council with Robert Jahn investigating.

20.    On or about June and July 2023, witnesses, including Robbins, Gasper, and Salbato, gave statements to Robert Jahn at Employers Council regarding various misconduct in the Sheriff's Office.

21.    Robbins, Gasper, and, Salbato's and the other employees' complaints were not limited to just the discriminatory behavior by Barnes in relation to Robbins. They also complained about a multitude of misconduct by Barnes.

22.    Witness statements from the Employers Council investigation confirm that Undersheriff Barnes asked at least several additional employees if Robbins was receiving special treatment because of her sexual orientation.

23.    On or about June and July 2023, Robbins, Gasper, and Salbato gave statements to Jahn regarding various misconduct at the Sheriff's Office.

24.    On June 5, 2023, Gasper did an interview with Jahn in which she described various misconduct and policy violations that 1) Barnes had previously applied for a Sergeant position with the Sheriff's Office but then Sheriff Hill had found her to be unqualified and declined to hire her due to issues with her ethics/integrity, 2) Barnes attempted to hire her partner, Brian Harris, as a deputy, and that Harris had past disciplinary issues with Colorado State Patrol, including allegations of sexual harassment and misconduct related to a high-speed chase and was forced to quit or be terminated, 3) Barnes had given Harris

(not a Sheriff's Office employee) their office access code, which was a breach of security,
4) Harris had engaged in appropriate behavior towards Gasper, 5) Barnes was acting
unethically and abusing her position, including circumventing procedure in hiring her
friend, Elizabeth Robinson as a Sergeant, and in the process, denying another deputy from
being considered for the position, and generally engaging in nepotism/favoritism in hiring,
6) Barnes had been insubordinate and disrespectful of Sheriff Smith, 7) Barnes had lied
about Gasper supposedly inappropriately fraternizing with a co-worker, 8) that Barnes had
failed to file a report on a criminal matter, 9) Gasper was concerning about the Sheriff's
Office being open to liability, and 10) the issues involving Barnes' questioning about
Robbins receiving "special treatment" because of her sexual orientation.

25.     On June 8, 2023, Salbato did an interview with Jahn in which he described various
misconduct and policy violations that 1) Barnes was not previously hired by the CCSO due
to integrity issues; 2) Barnes engaged in nepotism in attempting to hire her partner, Brian
Harris, as a deputy, and that Harris had past disciplinary issues with Colorado State Patrol,
including allegations of sexual harassment and other misconduct; 3) Barnes had given
Harris (not a Sheriff's Office employee) their office access code, which was a breach of
security; 4) Barnes was acting unethically and abusing her position, including
circumventing procedure in hiring her friend, Elizabeth Robinson as a Sergeant, and in the
process, denying another deputy from being considered for the position; 5) Barnes was not
qualified to hold the position of Undersheriff; 6) lacks proficiency in law enforcement
protocols, police work, and knowledge of the criminal statutes, and made many mistakes
as result; 7) failed to make or complete police reports; 8) failed to document and complete

an investigation of a crime; 9) hindering investigations; 10) been insubordinate and disrespectful to Sheriff Smith; 11) and lied to the Sheriff about a event involving co-worker Bre Gasper; and 12) that Barnes had asked a staff member about if Robbins received special treatment because she is a lesbian.

26.    On June 7, 2023, Robbins did an interview with Jahn in which she described various misconduct and policy violations that 1) Barnes questioned employees about if Robbins was getting special treatment based on her sexual orientation and being disrespectful toward her; 2) nepotism in hiring Elizabeth Robinson and attempting to hire Brian Harris; 3) Barnes had given Harris (not a Sheriff's Office employee) their office access code, which was a breach of security; and 4) Barnes being disrespectful. She also expressed concerns that she might be terminated due to her workplace injury/disability.

27.    Shortly thereafter, the Employers Council investigation was suspended at the direction of the Sheriff's Office.

28.    Robbins, Gasper, and Salbato sought to raise additional issues with conduct in the Sheriff's Office arising after their initial complaints to HR or about May 2023. However, Employer's Council refused to consider these additional issues.

29.    In 2023 through early 2024, Robbins, Gasper, and Salbato repeatedly voiced and raised issues to Smith regarding misconduct by Barnes.

30.    In the summer/early fall of 2023, Robbins repeatedly complained to Smith and HR about Barnes, including that 1) Barnes made derogatory comments and mocked her disability; 2) her work hours being reduced and/or her not being compensated for appointments as required by workers' compensation; 3) ethical issues with how she was expected to report

her hours under workers' compensation; 4) that she had to use time off for appointments were required to be compensated under workers' compensation; and 5) that it was not ethical/legal for her to take grant money from the state to pay her to fund a position she could not perform.

31.    In 2023 through early 2024, before she was terminated, Gasper repeatedly reported issues with Barnes to Sheriff Smith. The issues described herein were reported to Sheriff Smith shortly after the event.

32.    On or about June 2023, Gasper voiced that it was improper and unethical that Barnes had not filed a report concerning a domestic violence incident.

33.    On or about the fall of 2023, Gasper opposed the Sheriff's Office receiving state JBBS funds for jail services because Custer County no longer had a jail.  Gasper told Sheriff Smith that it was improper and unethical for the Sheriff's Office to receive such funds, which were apparently being used to pay Gasper's salary.

34.    On or about December 2023, Gasper informed Barnes that she was mistaken about the appropriate law/procedures regarding who should or needed to be present during meetings with a crime victim.

35.    On or about January 2024, Gasper voiced to Barnes that it was not appropriate/lawful to make certain redactions to records being released to the media following a lawsuit being filed against deputies in the Sheriff's Office, accusing them of using excessive force with a runaway teenager, among other misconduct because the public should be entitled to this information.

36. On or about February 2024, a Victims' Advocate with the 11th Judicial Court District Attorneys' Office asked Gasper about if evidence in a homicide case had been mishandled by persons in the Sheriff's Office, namely Barnes, and if it could jeopardize the criminal prosecution.

37. As a result, Gasper was contacted and gave an interview with an investigator for the District Attorney. Gasper provided her honest knowledge of the matter in that interview.

38. Thereafter, Smith and Barnes accused Gasper of going to the District Attorney to "slander them."

39. In 2023, Salbato repeatedly confronted Barnes about her improper, unethical, and illegal behavior, including:

   a. Barnes not knowing the criminal statutes (the basis for charging someone with a crime);

   b. Handling cases improperly, including not timely filing charges;

   c. Failing to file a report of theft and forgery for over a month;

   d. Failing to schedule required training for deputies;

   e. Being disrespectful to Sheriff Smith;

   f. That deputies did not want to work with her on scene because of her poor firearms proficiency, so they were afraid for their safety in her being able to "cover" them in a critical situation;

40. In 2023, before he was terminated, Salbato repeatedly reported the above issues with Barnes to Sheriff Smith shortly after the event.

41.    In November 2023, Salbato was one of the first responding officers to a triple homicide with another surviving gunshot victim. CCSO personnel obtained a search warrant to investigate this case and conducted a search.

42.    Later, after the first search, Barnes wanted officers to conduct a second search. Salbato told Barnes that search was not authorized by the warrant. Barnes insisted on conducting the search anyway. The Court later excluded evidence from the second search because it was an illegal search.

43.    On January 17, 2024, the County/Sheriff's Office requested an investigation report from Employers Council and received the statements that had been provided by Gasper, Robbins, and Salbato to Employers Council detailing allegations of misconduct in the Sheriff's Office, including discrimination against Robbins.

44.    On January 22, 2024, Robbins filed a complaint regarding with the CCRD.

45.    On or about January 31, 2024, the County/Sheriff's Office was provided notice that Robbins had filed a complaint with the CCRD.

46.    Gasper was a well-known as a witness for Robbins; she had made complaints about the same and she was named as a witness in Robbins' CCRD complaint.

47.    Salbato was a well-known as a witness supporting Robbins from his prior complaints.

48.    On March 7, 2024, Salbato provided a statement to the CCRD about how Barnes had been asking employees questions about if Robbins was receiving special treatment due to her sexual orientation.

49. Plaintiffs' speech in raising these complaints about discrimination and misconduct, as detailed further herein, was not a part of their ordinary job duties and did not concern the performance of their job or them personally in the workplace.

*Gasper Retaliation, Discharge, Arrest, and Prosecution*

50. On or about December 19, 2023, Barnes orchestrated a campaign of "complaints" about Gasper. Barnes solicited others to air their "complaints" about Gasper, no matter how trivial.

51. These were not so much "complaints" but what Barnes asked others to say about Gasper, some of which were not even "complaints" at all.

52. None of these "complaints" were ever even brought to Gasper's attention, nor was she ever reprimanded or disciplined regarding these supposed "complaints."

53. On February 15, 2025, Gasper was notified of the intent to terminate her employment for "not performing to expectations required for your position."

54. On March 3, 2024, Sheriff Smith notified Gasper that his decision was "final" and she was terminated.

55. On or about April 2023, and before Gasper was terminated, the Sheriff's Office purchased Apple laptops and iPads ("Apple equipment") using JBBS funds.

56. JBBS (Jail Based Behavioral Health Services) funds are provided by the State of Colorado to provide behavioral health services (*i.e.,* mental health and substance abuse services) to jail inmates.

57. Gasper was one of roughly a dozen employees, including patrol and detentions deputies, in the Sheriff's Office who were given Apple equipment, originally with the intent of them being used for certain software for work purposes.

58. On or about August-September, 2023, Undersheriff Barnes determined that the software the department wanted to use was incompatible with the Apple equipment and could not be used for law enforcement purposes.

59. Thereafter, Sheriff's Office employees were told they could use the Apple equipment however they wanted and accordingly, employees used them for many purposes, including purposes unrelated to their employment as law enforcement officers and for personal use.

60. Instead of simply asking Gasper for the Apple laptop back when she was terminated or sometime later, Sheriff Smith asked the District Attorney's Office to investigate and prosecute Gasper.

61. At this time, Linda Stanley was the 11th Judicial District Attorney and Matthew Gribble and Andrew Corey were employed with her office.

62. On April 18, 2024, Sheriff Smith sent an email to then-District Attorney Linda Stanley, copying Investigator Matthew Gribble, requesting that the District Attorney's Office locate and recover a laptop that appeared to be missing and in the possession of Gasper.

63. When investigators came to Gasper's place of business asking about the location of laptop, Gasper retrieved and gave the laptop to the investigators.

64. Thereafter, on May 8, 2024, the 11th Judicial District Attorney Office's Investigator Matthew Gribble submitted an Affidavit for Arrest Warrant for Gasper in relation to the

laptop. The Affidavit states that District Attorney Linda Stanley reviewed and approved the Affidavit.

65.     Gasper was charged with: 1) C.R.S. § 18-8-407 (1) Embezzlement of Public Property and 2) C.R.S. § 18-4-401 (1) (a) Theft (M2).

4.     No other employees using and possessing laptops for their own use were charged with 1) C.R.S. § 18-8-407 (1) Embezzlement of Public Property and 2) C.R.S. § 18-4-401 (1) (a) Theft (M2).

5.     Approximately a dozen other Sheriff's Office employees were given Apple equipment and permission to use it for their personal use/how they want.

6.     Some of these employees are no longer employed with the Sheriff's Office.

7.     There was not probable cause to support that she "knowingly" converted or used public property with the intent to deprive someone else of use because she only retained a laptop she was already given, told she could have for personal use, and was never

***Salbato Retaliation, Discharge, Arrest, and Prosecution***

66.     On or about January 2024, Smith requested El Paso County IA investigate Salbato for allegedly being present at a party/gathering where there was underage consumption of alcohol and/or marijuana. Nothing came of this and it was not even known to Salbato that Smith had requested this investigation until months later.

67.     On February 6, 2024, Barnes sent Salbato a letter notifying him of the pending investigation by the El Paso County Sheriff's Department into any violations of policy and procedures occurring between January 16 and 31, 2024. The alleged policy violations are not specified.

68.     On or about February 9, 2024 (according to a letter dated February 21, 2024), Barnes requested that the El Paso County Sheriff's Office assist with an investigation of Salbato.

69.     On February 10, 2024, Barnes sent a letter to Salbato notifying him of a criminal investigation being initiated by Smith regarding allegations that Salbato "failed to report a suspected child abuse case to DHS and did not follow-up or open a report for said case." The letter stated Salbato was being investigated for criminal violations of C.R.S. 19-3-304 (persons required to report child abuse or neglect) and C.R.S. 19-3-308(5) (procedures for investigating child abuse/neglect). The letter informed Salbato that he was being placed on administrative leave.

70.     C.R.S. 19-3-308(5) is not a criminal statute and does not provide a basis for charging someone with a crime.

71.     On or about February 14, 2024, Barnes emailed "information [she] has about this case" to Investigator Corey.

72.     On February 19, 2024, Smith emailed DA Stanley and Investigator Corey requesting that they investigate members of the Sheriff's office and members of the community for violations "in regards to investigating and reporting a child abuse event." Salbato is the only person named in the email. The email also indicates that "Barnes has conducted additional research and will email…"

73.     In February 2024, Linda Stanley was the 11th Judicial District Attorney and Andrew Corey was employed with her office as an investigator.

74.     On February 26, 2024, Salbato was charged with 1) failure to report child abuse, C.R.S. §
        18-3-304 (M2); and 2) reckless endangerment, C.R.S. § 18-3-208 (M2) in relation to the
        incident where there were reports of suspected child abuse of I.C. to law enforcement.

75.     The Affidavit for Arrest Warrant states that Investigator Corey received an email from
        Undersheriff Barnes regarding "several items to review regarding the incident" (the reports
        of child abuse to law enforcement).

76.     On February 26, 2024, Salbato was arrested and taken to jail.

77.     On March 4, 2024 (updated from a February 27, 2024 letter), Sheriff Smith sent Salbato a
        letter stating that Salbato was being terminated because "you are not performing to
        expectations required for your position" and "additionally, you have been charged with a
        crime in regards to your failure to immediately refer the case for investigation."

78.     On September 25, 2024, all charges against Salbato were dismissed. In her Order
        dismissing the charges, the Judge agreed that there was no legal basis for charging Salbato
        with a crime.

79.     There was no probable cause for arresting and prosecuting Salbato.

80.     There was no reasonable basis in law for believing that Salbato should be charged.

81.     Further, there was no reasonable basis in fact that Salbato committed a crime based on ***the
        police report he filed*** attached his Arrest Affidavit that provide the basis for his arrest and
        the charges.

82.     Defendants Smith and Barnes also sought for Salbato to be put on the "Brady list." When
        an officer is found to have engaged in dishonest conduct reflecting on his/her candor for
        truthfulness before the Court, the law requires that the officer be put on a "Brady list"

14

informing the public of this fact and notices be sent to defendants in criminal cases involving that officer. Being "Brady-listed" negatively affects a law enforcement officer's ability to work and employability.

83.   Multiple other people with knowledge of the alleged child abuse and who were mandatory reporters (or potential mandatory reporters) were not charged with failure to report like Salbato.

84.   These persons were all named in police reports submitted by law enforcement officers on or about the same time Salbato submitted his report, which were available to and reviewed by the Defendants.

85.   Other employees at CCSO, including Susan Barnes, Michael DeLaurentis, Ray Perez, Pete Elliot, Michael Kear, and Miles DeYoung have engaged in serious misconduct and were not fired as a result and/or criminally prosecuted, only some of which are described below.

86.   Ray Perez was fired for repeatedly not showing up to court (which means there is a good chance the case was dismissed as a result), but he was later hired back.

87.   Susan Barnes engaged in an unlawful search in November 2023, resulting in evidence in a homicide case being excluded and was not terminated thereafter (she is no longer with the department as of January 2026 for unknown reasons).

88.   Pete Elliot violated a court gag order resulting in his testimony in a homicide case being excluded due to his lack of credibility and was not fired.

89.   Michael DeLaurentis was hired in April 2024 despite the fact that he was under investigation for misconduct relating to misuse of public funds for personal use at another department. This investigation is still pending.

90.    On January 18, 2022, CCSO deputies Michael Kear and Miles DeYoung repeatedly tased a runaway teenager (minor, L.Z.) who was not accused of committing any crimes. L.Z. was found by deputies in a trailer with only a bed and two adult men ( at least one of whom had an arrest warrant).

91.    Then-District Attorney Linda Stanley charged L.Z. The charges were later dropped.

92.    No charges were pursued by the CCSO and/or the District Attorney Stanley against the deputies who tased L.Z. nor the adult men she was found with.

93.    Upon information and belief, no investigation was conducted as to why a teenager was alone with two adult men in a trailer with only a bed.

94.    By the Spring of 2024, all employees who had complained about discrimination and misconduct in the Sheriff's Office - or simply opposed the new administration - were either terminated or resigned.

95.    In sum, as described in the factual allegations above, there was a concerted effort and pattern by Defendant(s) to deprive employees (including Plaintiffs) of their rights by retaliating against them by terminating their employment, seeking criminal charges against them, and to otherwise force out anyone who spoke up about discrimination and misconduct in Sheriff's Office.

96.    After Plaintiffs Gasper and Salbato were arrested and criminally prosecuted, other employees, including Robbins, saw the writing on the wall and resigned out of fear of what might happened to them.

97.    Barnes' actions were not isolated incidents or a mere lapse in judgment, but part of a broader pattern of conduct in a sustained campaign to oust and marginalize Robbins and

diminish her standing within the department based on her sexual orientation and disability, and to retaliate against her.

98.    Undersheriff Barnes' actions described above fostered a culture of disrespect in the workplace wherein employees could be insulted, intimidated, and ridiculed based on their sexual orientation and disability.

99.    This created a workplace culture in which employees were permitted to think that this kind of behavior by a supervisor was acceptable, to gossip about it, and follow the lead of their supervisor's actions.

100.    Moreover, Sheriff Smith often supported Barnes' actions and engaged in discriminatory and retaliatory actions as described in greater detail above.

101.    Robbins had no means to remedy being subjected to this treatment; she had to endure it or resign.

102.    Robbins feared that if she returned to work at the Sheriff's Office she would only be set up for failure and would have a target on her back for termination – or worse, criminal proceedings to get rid of her like had happened with Gasper and Salbato.

103.    On May 1, 2025, when she completed her academy training and was thereafter expected to return to duty at the Sheriff's Office, Robbins submitted her resignation letter.

104.    By late spring of 2024, all of the other Sheriff's Office employees who had complained about misconduct and discrimination in the Sheriff's Office were terminated or resigned.

105.    The Sheriff's Office created a policy, practice, or custom wherein anyone who spoke up about misconduct in the department would be terminated and criminally prosecuted.

106.    Employees who did not speak up against discrimination and other misconduct were not similarly terminated or criminally prosecuted.

107.    As Sheriff, Defendant Smith is the final policy-making authority with control over the decisions to terminate employees. In other words, his actions and decisions have the force of law because he is the final decision-maker and his actions/decisions cannot be changed or overruled by any other person in County government.

108.    As Undersheriff, Defendant Barnes was provided actual and/or apparently authority by Sheriff Smith to make policy on behalf of the Sheriff's Office/the entity/Sheriff Smith.

109.    Further, the Sheriff's Office/Sheriff Smith ratified the conduct of employees by approving of retaliation against employees who engaged in civil rights and constitutional activities or by more tacitly approving of their conduct by inaction by ignoring and dismissing the fact that there were well-known issues with discrimination and misconduct in the department, as described in greater detail above.

108.    The Sheriff's Office/Smith/Barnes engaged in a "you are with us or you are against us" mentality in which certain persons have absolute authority that cannot be questioned and any dissonance will be met with termination – or worse criminal prosecution.

109.    It is clear that participation in civil rights activities, including opposition to discrimination and other misconduct, even speech in furtherance of the law and interest of justice, will be met with punishment if it reflects badly on the Sheriff's Office or certain individuals within the Sheriff's Office.

110.    These issues stem, in part, from a complete failure to train and supervise Sheriff's Office employees.

111.     The lack of training and supervision is evident by the fact that civil rights complaints and complaints about misconduct are ignored and dismissed or poorly investigated - if they are investigated at all. Worse, allegations of misconduct are met by retaliation against those only desiring to do what is right and tell the truth.

## CLAIMS FOR RELIEF

### Monell Claim Under 42 U.S.C. § 1983
### (Against the Entity)

112. Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

113. The Defendants subject to this cause of action are against: the governmental entity – Custer County, the BOCC, the Sheriff's Office, or the Sheriff in his official capacity (however named).

114. As further described in the factual allegations, the entity has a pattern, practice, or custom of retaliating against employees who complain about rights violations.

115. These actions violate the U.S. Constitution, including the First Amendment and Equal Protection under the 14th Amendment, and the law of the United States.

116. These actions amount to a widespread practice that is so well entrenched in the entity that it has the force of law.

117. The entity has created a pattern, practice, and custom in which any employee who opposes discrimination and misconduct in the government will be denied legal protection, their complaints will be ignored, dismissed, or discredited, and they will be terminated or even criminally prosecuted.

118. Defendants Smith and Barnes, who engage in this kind of conduct, are persons who have final policymaking authority and speak for the Sheriff's Office and/or entity as a whole.

119. Further, the final policymakers (Smith and Barnes) ratified the actions of employees/officials who engage in this kind of conduct by explicitly supporting and approving of this conduct, and encourage others to engaged in the same.

120. Worse, the entity even affirmatively engages in efforts to discredit employees who spoke up against misconduct and engaged in coordinated efforts to trump up "problems" with the employee to force them out of their jobs.

121. Accordingly, policymakers exhibited a deliberate indifference to the rights of employees.

122. The entity made a deliberate choice to endorse and approve behavior that violated rights - or worse, intentionally caused harm by encouraging behavior that violated rights.

123. There is a complete failure to provide adequate training and supervision of entity officials/employees.

124. As a result, substantial complaints and issues are ignored or poorly investigated – if they are investigated at all – or worse, met by retaliation.

125. The need for training and supervision is plainly obvious the entity and its officials/employees so continually violate rights, yet this need was ignored by the entity.

126. Final policymakers were deliberately indifferent to the risk posed to the public by failing to train and supervise officials/employees and allowing, or even encouraging, the violations of rights.

127. Officials/employees not only suffer from a failure of training and supervision that their behavior is unacceptable but are even encouraged to engage in such behavior and to support those who do.

128. Thus, the entity was the "moving force" behind constitutional violations.

129. These failures by the entity have resulted in injury to many employees as described further herein and will continue to injure other employees if not stopped as evident by the fact that this is a repeated and ongoing issue.

130. The constitutional injury has been, and is, inevitable.

131. Plaintiffs suffered injuries as a result.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, awarding the following relief:

1. Compensatory damages for economic loss, including lost wages, benefits, and non-economic loss;

2. Punitive damages as permitted by law;

3. Pre- and post-judgment interest as allowed by law;

4. Reasonable attorneys' fees and costs as allowed by law;

5. Injunctive relief; and

6. Any other and further relief that this Court shall deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 6th day of February, 2026.

*/s/ Rachel B. Maxam* _____

Rachel B. Maxam, #47711
Law Office of Rachel B. Maxam, PLLC
405 Main St.
Westcliffe, CO 81252
Phone: (720)-526-2928
Fax: (720)-894-1471
Email: rachel@maxamlawfirm.com


*/s/ Yun Wang*
 Yun Wang
 BTW Legal
 999 18th Street, Suite 3000
 Denver, Colorado 80202
 Tel: 303.386.7125
 Email: ywang@btwlegal.com

*Attorneys for Plaintiff*